IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| Ophelia Azriel De'lonta,<br>    *Plaintiff*, | )<br>)<br>) |
|     *v.* | ) Civil Action No. 7:11-cv-00257 |
| Harold W. Clarke, *et al.*,<br>    *Defendants*. | )<br>)<br>)<br>) |

**DECLARATION OF DR. GEORGE R. BROWN, M.D., IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND TO COMPEL ACCESS TO PLAINTIFF**

I, George R. Brown, M.D., declare as follows:

1. I am a Professor of Psychiatry and the Associate Chairman at the East Tennessee State University Quillen College of Medicine Department of Psychiatry. I submit this declaration in support of Plaintiff Ophelia De'lonta's motion for a preliminary injunction and to compel access to Plaintiff.

**Qualifications**

2. I obtained my M.D. from the University of Rochester School of Medicine in 1983. I was an intern at the United States Air Force Medical Center, Wright-Patterson Air Force Base, and I completed the United States Air Force Integrated Residency in Psychiatry at Wright State University in 1987. I am licensed to practice medicine in Tennessee, Texas, and Ohio.

3. I am author or co-author of more than 130 peer-reviewed publications and scientific abstracts, many of which examine transgender issues or report the results of original research in the study of Gender Identity Disorder (GID). Several of my recent publications focus on the care of incarcerated persons with GID. I have been invited to deliver approximately 50 lectures

on the topic of gender identity disorders at about 30 medical schools and residency programs in the United States, and I have presented original research work in gender identity disorders internationally on at least 10 occasions over the past 26 years.

4. I have conducted research on transgender issues since the mid-1980s, including research on GID and the treatment and care of prison inmates with GID. I have been involved in the clinical evaluation of patients with GID for nearly twenty-nine years and I have evaluated and/or treated more than 500 patients with gender identity disorders, including approximately 8 individuals with GID who were, at the time of my evaluation, incarcerated. I have conducted research with several hundred additional persons with gender identity issues.

5. I have served for fourteen years on the Board of Directors of the World Professional Association for Transgender Health (WPATH), formerly known as the Harry Benjamin International Gender Dysphoria Association (HBIGDA), and I continue to serve in that capacity at the time of this declaration. WPATH is the only professional organization specifically devoted to the understanding and treatment of GID.

6. WPATH publishes peer-reviewed Standards of Care that are the internationally accepted protocols for the treatment of GID. The Standards of Care are based on the best available science and expert consensus, and they are updated and revised as new scientific information becomes available.

7. I was a member of the WPATH committee that authored Version 7 of the Standards of Care, published in 2011, which is the current version. I personally authored the section addressing the treatment of incarcerated persons suffering from GID in Version 7. Version 7 of the Standards of Care (SOC) was first published in the *International Journal of Transgenderism* in 2011.

8. Four federal judges have relied on my expert medical opinion in lawsuits involving the treatment of individuals with GID, including the treatment of prisoners with GID. These include:

    a. Judge Mark L. Wolf of the United States District Court in the District of Massachusetts in *Kosilek v. Spencer*, 1:04-cv-11591-MLW.

    b. Judge C.N. Clevert, Jr. of the United States District Court in the Eastern District of Wisconsin in *Fields v. Smith*, Case No. 06-C-112.

    c. Judge Joseph H. Gale of the United States Tax Court in *O'Donnabhain v. Commissioner of the Internal Revenue*, No. 6402-06.

    d. Magistrate Judge Mikel H. Williams of the United States District Court in the District of Idaho in *Gammett a/k/a Jennifer Ann Spencer v. Idaho State Board of Corrections*, No. CV05-257-S-MHW.

## GID and the Standards of Care

*Overview*

9. GID is a serious medical condition characterized by a strong and persistent cross-gender identification and persistent discomfort with one's sex or sense of inappropriateness in the gender role of that sex, causing clinically significant distress or impairment in social, occupational, or other important areas of functioning.

10. The Standards of Care set forth the appropriate, minimum, generally accepted protocols for treatment of GID, which include four phases: (1) psychotherapy; (2) hormone therapy; (3) experience living in the identity-congruent gender role (formerly referred to as the "real-life experience" living as a member of the anatomically opposite sex); and (4) sex reassignment surgery.

11. Pursuant to the Standards of Care, sex reassignment surgery is medically necessary in some individuals. Specifically, the Standards of Care provide: "While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria…. For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity." Ex. 1,[1] Standards of Care 199 (hereinafter "SOC"). In such cases, the surgery is not experimental, elective, or cosmetic; rather, the community of experienced medical practitioners considers it an accepted, effective, medically necessary treatment for GID.

12. The Standards of Care consider sex reassignment surgery to be indicated for a GID patient where two evaluations for sex reassignment surgery, both of which must be performed by appropriately trained and experienced mental health professional, result in a determination that sex reassignment surgery is the appropriate course of treatment. SOC 201-03. The criteria used to determine whether sex reassignment surgery *evaluation* is medically necessary (previously referred to as "eligibility criteria") are distinct from the criteria used to determine whether sex reassignment surgery *itself* is medically necessary at a particular point in a patient's treatment (referred to as "readiness" for sex reassignment surgery).

13. An evaluation for sex reassignment surgery is medically necessary when a patient continues to experience clinically significant symptoms of gender dysphoria in spite of receiving nonsurgical treatments for GID, so long as the patient meets certain prerequisites.

---

[1] All exhibits cited herein are attached as exhibits to the accompanying Declaration of Don Bradford Hardin, Jr. ("Hardin Decl.").

Specifically, the patient must have been on cross-sex hormones for at least one year, be over the age of 18 at the end of that year, have lived at least 12 months in his or her desired gender role to the extent possible, and have made progress in the treatment of other psychiatric and/or medical diagnoses.

### *Qualifications of Clinicians Who Treat GID*

14. The Standards of Care list certain "recommended minimum credentials" for clinicians who work with adults presenting with gender dysphoria. SOC 179. In addition to these minimum credentials, mental health professionals should develop and maintain cultural competence to facilitate their work with transsexual, transgender, and gender-nonconforming clients. Knowledge about sexuality, sexual health concerns, and the assessment and treatment of sexual disorders is preferred. *Id.* Further, because this specialized field of medicine is associated with a large amount of literature and ongoing improvements and refinements in care, professionals involved with the assessment and management of persons with GID must regularly update their knowledge base by working and learning directly from those who have extensive experience in this field.

15. Mental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria. SOC 179. While clinicians are encouraged to pursue self-study and to seek out relevant adult learning programming, participation in such activities is no substitute for first-hand experience, exposure to a wide array of clinical presentations of GID, or the mentorship and supervision of an experienced clinician.

16. A broad depth of first-hand clinical experience, preferably with guidance from a seasoned mentor, is critical in formulating and executing a treatment plan. Treatment decisions made by individuals lacking the requisite clinical experience can result in wholly inadequate or possibly dangerous care for a person with GID. Examples of this abound in my clinical experience over the past three decades.

17. One of the most difficult aspects of identifying and treating patients with GID is distinguishing co-existing mental health concerns from GID. In many patients, the clinical presentation of GID can substantially overlap with other psychiatric conditions; experience with GID is essential in determining whether symptoms such as depression, anxiety, irritability, or desire to inflict self-harm result from GID, another psychiatric condition, or both. The ability to distinguish GID-related concerns from comorbidities is developed only through evaluation and treatment of multiple GID patients over time. Mental-health professionals who treat one or only a few GID patients lack sufficient exposure to the requisite array of co-existing mental-health concerns to enable them to meaningfully distinguish between GID-related symptoms and behaviors, on the one hand, and those occasioned by other mental-health problems, on the other hand. Similarly, ensuring that non-GID related mental health symptoms do not hinder GID treatment requires a depth of experience treating GID that can be acquired only by treating many patients over time.

*Evaluation for Sex Reassignment Surgery*

18. Evaluation of a patient's readiness for sex reassignment surgery must be conducted by an experienced clinician with a broad depth of knowledge and expertise with many patients with GID. Such an evaluation generally consists of a lengthy in-person interview, review of the medical records to include laboratory assessments, a focused physical exam where indicated,

consideration of information from collateral sources who know and interact with the patient, and discussion of progress on psychiatric and/or medical comorbidities with the treating clinicians. The evaluator determines whether the patient in fact continues to suffer from gender dysphoria; whether the patient has completed the prerequisites to surgery; whether the patient has the capacity to make a fully informed decision and to consent to treatment; and whether any significant medical or mental health concerns apart from GID are well controlled.  SOC 187.

19. Evaluations by experts are not just to determine readiness for surgery, even if that is their professed aim.  The evaluation for sex reassignment surgery is also useful to determine the adequacy of current, nonsurgical GID treatments, which is an especially valuable function when the treating individual or team has limited experience treating persons with GID, as is the situation in Ms. De'lonta's case.  The evaluation itself, therefore, is essential to assessing treatment needs and the adequacy of ongoing treatment, and the failure to provide such an evaluation constitutes a denial of medically necessary treatment and is inconsistent with the Standards of Care.  In some cases nonsurgical treatments will never be adequate, but in others, poor implementation stymies treatments that might otherwise relieve the symptoms of GID.  Only a clinician with significant training and experience can make this distinction, and only by evaluating the patient in a manner consistent with the Standards of Care.  Without conducting an evaluation, no clinician can meaningfully consider potential adjustments to the patient's treatment regimen that might address her GID without surgical intervention.

20. Evaluation of a GID patient by an expert ensures that GID-related symptoms are properly identified and managed through cross-sex hormones, therapy, and any other parts of an individualized treatment regimen.  GID patients are to be regularly evaluated by a specialist—just like patients suffering from any number of other complicated diseases and disorders—

because identifying the specific disorder-related symptoms, separating them out from other mental health symptoms, and ensuring adequate treatment is an ongoing, medically necessary obligation. Periodic evaluations are particularly important where an individual suffers from persistent gender dysphoria, is taking cross-sex hormones (which can affect co-occuring mental health problems), and displays severe symptoms such as the infliction of self-harm, in particular, genital harm or attempted autocastration. The need for close monitoring and careful evaluation is particularly acute for incarcerated patients, who are at greater risk for life-threatening complications like suicidality and autocastration.

### *Application of the Standards of Care to Incarcerated Persons*

21. In recognition of the large number of individuals with GID who live in various institutional settings (*e.g.*, prisons, group homes, etc.), the Standards of Care address the treatment and evaluation of such individuals specifically. The Standards of Care state that "[a]ll elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions" and that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements." SOC 206-07. When a person lives in an institutional setting and the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess or treat people with GID, the institution should obtain outside consultation about this specialized area of health care in order to ensure minimally adequate care.

22. The Standards of Care permit certain, reasonable accommodations to the institutional environment "if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria." SOC 207. For example, in an environment where diversion of oral preparations is highly likely, injectable hormones may be prescribed instead, if

not medically contraindicated. However, "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the [Standards of Care]." *Id.*

23. Where a person who lives in an institutional setting has exhausted the other treatment options (*i.e.*, psychotherapy, hormone therapy, real-life experience) under the Standards of Care and continues to exhibit symptoms of GID, sound clinical practice dictates that the institution must provide an expert evaluation to determine whether sex reassignment surgery is medically necessary. Failure to provide such an evaluation places the patient at unnecessary risk of serious medical and psychiatric consequences that include major depression, attempted or completed autocastration/autopenectomy, and suicidality.

**VDOC's Treatment Guidelines**

24. I have reviewed a series of documents that appear to be Virginia Department of Corrections (VDOC) internal guidelines for the assessment and treatment of incarcerated persons with GID, as revised in 2005, 2011, and 2013, as well as one undated version. The procedures set forth in each of these guidelines are grossly clinically inappropriate and inconsistent with the Standards of Care in numerous respects.

25. To take the most recent version as an illustrative example: The 2013 guidelines (the "Guidelines"), which were promulgated well after Version 7 of the Standards of Care were published, purport to rely on Version 6 of the Standards of Care. The Guidelines are thus at least a decade out of date with regard to sound clinical practice. *See* Ex. 13 at 5929 (citing 2001 HBIGDA Guidelines).

26. The most disturbing aspect of the Guidelines is that they appear to consider all "surgical procedures for initiation, advancement or maintenance of sex reassignment" as

"[c]osmetic and elective." Ex. 13 at 5927 ¶ 16. As explained above, the Standards of Care have long provided that, for certain patients, sex reassignment surgery is neither elective nor cosmetic, but rather medically necessary. Of course, to determine whether this is the case for a given individual, an expert evaluation is required. The Guidelines make absolutely no provision for such an evaluation.

27. Further, the Guidelines provide that an incarcerated person shall receive a "full medical and mental health evaluation" upon asserting GID. Ex. 13 at 5925 ¶ 1. This evaluation is to be submitted to VDOC's Chief Psychiatrist, who may then choose to refer the case to a GID expert. *Id.* ¶ 6. However, the Guidelines are silent as to the minimum qualifications of the person or persons who are to perform the evaluations that are the basis for the Chief Psychiatrist's referral decision. Indeed, the 2011 guidelines expressly permit these evaluations to be performed "by any member of the Mental Health Staff," including those who are "non-licensed," such as social workers with no training whatsoever in the management or treatment of GID. Ex. 12 at 5918 ¶ 1. It is grossly clinically inappropriate for any physician to determine whether a patient requires evaluation by a GID expert based solely upon a report by a staff member with little or no experience in the treatment or management of GID.

28. The same flaw is built into the provision in the Guidelines for the formation of a "treatment team" for persons diagnosed with GID. The team is to consist solely of VDOC staff, Ex. 13 at 5925 ¶ 8, and no minimal professional or medical qualifications are required for any team member—let alone any level of knowledge of GID. Predictably, this policy flaw has led to the formation of a treatment team for Ms. De'lonta that is grossly unqualified to make treatment decisions, as it is composed primarily of non-clinical personnel and includes no member with meaningful experience in the treatment of GID.

29. The development of the Guidelines over time is telling. In 2005, the guidelines stated explicitly that, no matter the medical need, "[n]o surgical procedures for the purpose of sexual reassignment will be provided to any inmate incarcerated in the DOC." Ex. 7 at 5912 ¶ 7. The current Guidelines put things differently, but to the same effect, stating explicitly that "the sexual reassignment process will not be furthered during ... incarceration." Ex. 13 at 5926 ¶ 13. The Guidelines thus endorse a "freeze frame" approach to GID management for incarcerated persons: Under the Guidelines, the inmate's state of transition at the time of incarceration will be managed, but "will not be furthered" regardless of medical need. In my medical judgment, this "freeze frame" approach is, unethical, clinically inappropriate, ineffective, and, in many cases, affirmatively damaging to the patient.

**Ms. De'lonta's Treatment**

30. I have reviewed a number of documents related to Ms. De'lonta's medical history and the treatment she has received for GID as well as other mental-health concerns. I have also reviewed the transcripts of the depositions of Dr. Meredith Cary, Lisa Lang, and Jeena Porterfield, as well as the *curricula vitae* of Dr. Cary and Ms. Lang. My conclusions about Ms. De'lonta and her treatment thus far are based upon this very limited set of documents. I have not been able to evaluate Ms. De'lonta because, as counsel for Ms. De'lonta has informed me, VDOC has refused to allow me access to Ms. De'lonta to conduct an evaluation.

*Defendants' Experience with GID*

31. Having reviewed Dr. Cary's CV; Ms. Lang's CV; and the deposition testimony of Dr. Cary, Ms. Lang, and Ms. Porterfield, I have concluded that none of these individuals has the experience or expertise required to evaluate the severity of Ms. De'lonta's GID or her readiness for an evaluation for sex reassignment surgery. I have also concluded that their explanations for

why Ms. De'lonta is not currently ready for an evaluation by a professional who does possess the requisite experience are entirely without medical justification.

32. Ms. Porterfield testified that Ms. De'lonta was the first person with GID that she has treated as a therapist and that she has not provided long-term treatment to any other GID patient. Ex. 10, Porterfield Tr. 16:2-6; 17:15-24. She has no formal education concerning GID, and describes herself as only "minimally" familiar with the Standards of Care. *Id.* at 18:5-19:16.

33. Ms. Lang testified that she has no training in GID issues other than internet-based seminars taken on two occasions in the last year. Ex. 11, Lang Tr. 15:9-16:11. Although she states that she previously worked with several patients with "gender issues," she had not treated any patient with GID, any patient on cross-sex hormone therapy, or any patient pursuing sex reassignment surgery until she began treating Ms. De'lonta. *Id.* at 14:7-15:8. I also understand that Ms. De'lonta has complained in the past that treatment sessions with Ms. Lang exacerbated her gender dysphoria.

34. Ms. Porterfield and Ms. Lang both testified that, during the time period in which they treated Ms. De'lonta, they were in the best position to evaluate Ms. De'lonta's mental health. Porterfield Tr. 21:3-7; Lang Tr. 20:22-21:2. Yet neither Ms. Porterfield nor Ms. Lang is a qualified GID expert; in fact, neither Ms. Porterfield nor Ms. Lang is minimally competent to assess or treat GID. While the Virginia Department of Corrections may believe that each is qualified to provide certain forms of counseling to prison inmates—a question on which I take no position—they are emphatically not qualified to make treatment decisions about a patient with GID, including that such an individual is not ready for an evaluation for surgery by a clinician with expertise in this specialized area of medicine.

35. Neither Ms. Porterfield nor Ms. Lang has the necessary medical training, exposure to multiple GID patients, or experience evaluating or treating individuals with GID to make an informed medical judgment about the appropriate treatment and care for Ms. De'lonta. *See supra* ¶¶ 15-17, 20. Indeed, without having treated a patient with GID before encountering Ms. De'lonta, neither Ms. Porterfield or Ms. Lang would have an understanding of the spectrum of GID symptoms or a point of comparison by which to evaluate Ms. De'lonta. It is alarming that neither is willing to acknowledge the limitations of their training and experience and the potential for harm that inappropriate treatment decisions can bring

36. Dr. Cary, who is a trained psychiatrist, claims that she is "competent in the area of GID treatment" because she was involved in the treatment of three GID patients during her residency. Ex. 5, Cary Tr. 20:14-21, 13:16-24. Resident physicians are in training and do not have primary responsibility or authority to make treatment decisions concerning the patients that they see. Whatever experience Dr. Cary had with GID patients during her residency is, by definition, quite limited and does not furnish the sort of treating experience that is required to make informed decisions about the medically necessary treatment for individuals suffering from GID.

37. Dr. Cary also considers herself to be a "specialist" in the treatment of individuals with GID because she oversees such treatment within the Department of Corrections. Cary Tr. 21:1-5. But Dr. Cary has treated no patients since completing her training and accepting her current position at VDOC, and has never evaluated any patient for sex reassignment surgery. *Id.* at 98:13-17.

38. In my professional judgment, no medical doctor speaking in good faith would claim competence in the field of GID with such minimal professional experience. Dr. Cary's limited

exposure to patients with GID would frustrate, if not entirely impede, her ability to make medically sound judgments with respect to diagnoses and treatments of such patients.

39. By way of illustration, Dr. Cary testified that when Ms. De'lonta cut her testicles in October 2010 and December 2010, Dr. Cary determined that these incidents of self-injury were not related to Ms. De'lonta's GID. Rather, Dr. Cary suggested that such self-injurious behavior "was deemed to be related to her Axis II [disorders]"—*i.e.*, psychiatric conditions other than GID. Cary Tr. 81:16-25. Dr. Cary admittedly never evaluated Ms. De'lonta (*id.* at 35:5-6) and could not make such a judgment without having done so. What is more, given Dr. Cary's lack of direct exposure to patients with GID and her lack of experience evaluating patients with GID, she is likely unable to distinguish GID-related symptoms from what she calls "Axis II [disorders]." As explained above, this is one of the most challenging aspects of treating patients with GID, and one that only an experienced practitioner can adequately handle.

40. Indeed, genital self-harm is a hallmark symptom of severe gender dysphoria, psychosis, or both. Anyone familiar with the disorder and acting in the best interest of her patient would have recognized the need to reassess the patient's treatment regimen in light of the patient's continuing severe distress. Since I have not been allowed to evaluate Ms. De'lonta, I am not in a position to render a diagnosis in her case or to make any treatment recommendations. Genital self-harm could be misinterpreted as simply another cutting behavior commonly seen in patients with borderline personality disorder, but the behaviors and the goals of the behavior when directed at the genitals are quite different than the more common behavior of making superficial cuts on limbs, and failing to understand this distinction can lead to life-threatening consequences, including suicide and severe hemorrhage from autocastration attempts or completions.

41. Dr. Cary's competence in the treatment of GID is further called into question by her acquiescence in the incentive program under which Ms. De'lonta is denied medically necessary feminizing items. Particularly egregious is Dr. Cary's decision to deny Ms. De'lonta access to a prescription medication recommended by her endocrinologist and to include that medication as part of a behavioral plan, under which Ms. De'lonta receives feminizing items after maintaining good behavior for a period of time. After Ms. De'lonta's endocrinologist recommended that she be given a prescription depilatory cream designed to decrease facial hair, Dr. Cary directed that the cream instead be included as an incentive for Ms. De'lonta's good behavior as part of this plan. Dr. Cary testified that the decision was made to treat the cream as a feminizing product and to withhold it as an incentive because "it wasn't a medical necessity." Cary Tr. 91:9-17.

42. Hormone treatment and other medications designed to make a patient more comfortable with his or her outward appearance can be medically necessary for individuals with GID and a specialist is required to determine whether such treatment is required for each patient on an individualized basis. Additionally, when patients suffering from GID do not receive the necessary treatment, they are susceptible to increased anxiety, depression, and other symptoms that may affect their behavior, including suicidality and genital self-harm or genital self-surgery. The behavioral plan thus places patients in a conundrum: Without the medically necessary treatment, they can struggle to control the presentation of behavioral symptoms of GID; but the inability to control the behavioral symptoms of GID bars them from receiving the necessary treatment.

43. Even if Dr. Cary were competent to make an informed medical judgment about Ms. De'lonta's readiness for an evaluation for sex reassignment surgery—and she is not—her minimal direct experience with Ms. De'lonta means that she has no medically appropriate basis

on which to formulate her opinions and judgments. Dr. Cary testified that she does not treat any inmates herself; her job is "administrative" and involves oversight of the treatment of thousands of inmates, a very small number of whom suffer from GID. She affirmatively disclaims any role as Ms. De'lonta's psychiatrist. Cary Tr. 84:19. She has met Ms. De'lonta only once, and she has never evaluated Ms. De'lonta. Without having personally examined and observed Ms. De'lonta, Dr. Cary is not in a position to put forth any creditworthy judgments regarding Ms. De'lonta's treatment and her readiness for an evaluation for sex reassignment surgery.

44. Finally, in spite of describing her position as "administrative," it is clear from the record that Dr. Cary is substantively involved in the direction of treatment for a patient that she has not assessed herself, which is quite unusual given the complexities of Ms. De'lonta's clinical needs and extensive litigation in this case.

### *Defendants' Reasons for Refusing an Evaluation*

45. During my review of the relevant documents, I noted several explanations offered by Defendants for why Ms. De'lonta has not been evaluated by a GID specialist since 2006 and would not, in their estimation, be an appropriate candidate for sex reassignment surgery. Regardless of whether Defendants' explanations for why Ms. De'lonta is not a good candidate for *surgery* are valid—a question on which I express no opinion here because I have not personally evaluated her—nothing they said in their depositions suggests to me that it is medically advisable or necessary to deny her an evaluation. Based on the limited information now available to me, I am able to say with a reasonable degree of medical certainty that an evaluation is medically necessary for Ms. De'lonta. All the information presently available to me indicates that the treatment plan that VDOC has devised for treatment of her GID is

ineffective at best and affirmatively damaging at worst, given the severity of her recent GID symptoms.

46. Defendants' justifications for their decisions underscore the need for that evaluation to be performed by a qualified medical professional experienced in the diagnosis and treatment of GID. For example, Dr. Cary testified that Ms. De'lonta did not meet all eligibility requirements for an evaluation because "[s]he was still psychiatrically unstable from her Axis II diagnosis." Cary Tr. 52:11-15. It is well-established that the presence of other psychiatric disorders is not a valid reason to refuse to evaluate a patient for sex reassignment surgery.

47. The mere presence of other mental health disorders does not provide a sufficient basis for denying necessary medical treatment for GID. Such disorders, when poorly controlled, *may* contraindicate a *referral* for sex reassignment surgery, but such a determination could only be reached after a GID specialist has been given the opportunity to perform a thorough evaluation of the patient. Indeed, even the diagnosis of schizophrenia is not a contraindication to performing an evaluation in a person who also has been undergoing treatment for GID.

48. Ms. Lang's explanations for why she believes that Ms. De'lonta is not ready for surgery are not credible. Ms. Lang testified that, in her opinion, Ms. De'lonta is not ready for sex reassignment surgery because (i) she could not take proper care of herself post-surgery, (ii) she does not possess full awareness and understanding of the alternatives to sex reassignment surgery, and (iii) she does not possess a full understanding of the ramifications of undergoing sex reassignment surgery and becoming female. Lang Tr. 42:18-43:12. Ms. Lang simply does not have the experience required to reach these determinations with respect to a patient suffering from GID. Not only does Ms. Lang lack the expertise to predict Ms. De'lonta's ability to care for herself post-surgery, but she also reaches a dead wrong conclusion: A patient's inability to

care for herself is not a proper basis for denying medically necessary treatments or evaluations. Moreover, Ms. Lang has no basis for determining what being a woman means to a post-operative transsexual. Not one of Ms. Lang's conclusions provides a valid medical basis for denying Ms. De'lonta an *evaluation*. The evaluation itself is a specialist's opportunity to determine whether and how those factors affect an individual's readiness for sex reassignment surgery.

49. Defendants also appear to believe an evaluation is unnecessary because Ms. De'lonta has allegedly on some occasions failed to comply with her therapy regimen as prescribed by VDOC officials. Based on my experience treating hundreds of individuals with GID, I would expect that a patient such as Ms. De'lonta—who I understand to have demonstrated a decades-long commitment to transitioning—would be compliant with her treatment regimen unless that regimen was not adequately addressing her symptoms. Thus, non-compliance with a treatment regimen should be treated as a reason *for* an evaluation, rather than a reason to refuse an evaluation.

50. Finally, Defendants appear to believe that surgery is not medically necessary for Ms. De'lonta because her current treatment regimen is adequate. If that were the case, Ms. De'lonta would not be experiencing the symptoms she reports of severe gender dysphoria, including effectively destroying one testicle and attempting to eliminate the other.

51. I reviewed a number of documents relating to Ms. De'lonta's current treatment, as noted above. The records available to me are hardly consistent with a successful treatment plan for severe GID. For example a June 22, 2009 letter from a consulting endocrinologist at the University of Virginia, explained to Ms. De'lonta that she had "achieved 'medical castration'" because her testosterone level was less than 20. Ex. 25. This opinion may reflect the judgment

of an endocrinologist, but it also lays bare the need for an evaluation by a psychiatrist with expertise in the treatment of patients with GID. "Medical castration" refers to a laboratory assessment of the level of circulating testosterone and does not address *physical* castration. If one or both testicles are still present physically, a patient is not, in fact, castrated, and the mere presence of a testicle can lead to continued severe gender dysphoria. Patients with GID have a *repulsion* towards their birth genitals, which may be partially relieved by cross-sex hormones, but in many cases the continuing physical presence of the male genitals are a constant reminder of their condition.

### Conclusions

52. It is my professional opinion, held with a reasonable degree of medical certainty, that Ms. De'lonta should be evaluated at this time for adequacy of her current treatments for GID and for sex reassignment surgery.

53. VDOC is failing to provide medically necessary treatment by failing to have Ms. De'lonta evaluated by a medical expert with competency in the field of GID treatment and sex reassignment surgery. VDOC's actions are not within the bounds of minimally competent medical judgment, and they place Ms. De'lonta at a substantial risk of serious medical harm.

54. VDOC's failure to seek the advice of a specialist in connection with Ms. De'lonta's case has already resulted in numerous medical errors in relation to her treatment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 10, 2013.

_____
George R. Brown, M.D., DFAPA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of July, 2013, a true and correct copy of the foregoing Declaration of Dr. George R. Brown, M.D., in support of Plaintiff's Motion for a Preliminary Injunction and to Compel Access to Plaintiff was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all Counsel of Record.

By: /s/ Don Bradford Hardin, Jr.
Don Bradford Hardin, Jr. (Va. Bar No. 76812)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: bradford.hardin@wilmerhale.com

*Counsel for Plaintiff Ophelia Azriel De'lonta*